Morning, and may it please the court. As an aside, do I need to reserve time for rebuttal, or do I just take whatever's left when I stop? Well, you can try to reserve it, because even if you ask to, sometimes our questions and answers will lead into your time. But you're welcome to try to save some, regardless of whether you say anything about it now. Thank you. The district court in this case treated the summary judgment motions as if they were trials to the court. It did not draw all reasonable inferences in favor of the non-moving parties. It decided issues of fact. And most importantly regarding the issue of animus, the court seemed to treat every fact as if it was in a vacuum. And when I say that, I mean that he went through a list and he said, well, this fact doesn't establish animus in and by itself. And he went to the next fact, and he did make those same conclusions. And then after about 20 facts, he never put them all together and said, could a reasonable jury decide that putting all of these fact situations together, that this meets the very easy standard for getting beyond summary judgment on the issue of animus. There is substantial evidence in the record of animus, beginning with the testimony of, beginning with statistical evidence that we've cited in our brief that showed that over many, many years, the requests for an immediate license suspension in the city of Portland were made inordinately against clubs owned by black people. And let me ask you a question about one area of your case that concerns me. And that has to do with causation, because it appears that the license suspension occurred after there was a shooting at your client's establishment. And whatever may have been people's feelings before then, how is there a causal link when that provides a clear and reasonable ground for suspending the license? Well, our position is that it does not provide a clear and reasonable ground for establishing the license. Our position is that the decision in the first instance to seek an immediate suspension was racially motivated. There was a shooting, and there was what appears to have been lax security, people coming in, side doors that weren't appropriately screening for weapons, and so forth. So I take it that you're not challenging that those events occurred, but you're saying that it's pretextual, I assume? Yes, you're saying, Your Honor, that at the time this shooting occurred, my client had exactly one blemish on his record. He had a noise complaint. And then when the shooting happened, all these people came together, and we are claiming that all of the reasons that they cited is not having control of the premises, etc., etc., that all of those reasons were pretextual, that those reasons that he could not establish those reasons. For instance, they did not even— But the events did happen, correct? The shooting happened outside of the club. Right. I mean, it's sort of like saying, you know, this person shouldn't be punished for murder because all they've had is a driving violation before. I don't understand why his previously good record really has much to do with it. Because in virtually every other case in the last 10 years involving a white club or a non-black club, the city has not used the extraordinary—requested the extraordinary remedy of an immediate license suspension. Have there been similar circumstances where there was a shooting and evidence of insufficient security combined together? I believe that the record does contain that. I can't point to that right now. It is obviously difficult because every situation—you can say every situation is different. When I looked at the clubs that you identified in your briefs, I was having trouble finding the patterns you suggested. I saw that this Club 915, which was owned by an Asian, the city suspended the license. But in this season, which had a black owner, the OLCC did not grant the city's request. And there was a similar non-pattern, it seemed to me, in the other clubs that you referenced. So I was having trouble finding any pattern of this. And in particular, given that there were so few clubs identified, it was hard to see that there was even enough data to identify a pattern. But maybe you could speak specifically to which clubs and what the event was at the club that led to a request for a suspension, and whether it was ultimately suspended or not, and whether the owner was black or non-black. Well, I think our evidence is more general than that, Your Honor. I think our evidence is that in the course of the past 10 years, there had been 30 shootings related to a nightclub in Portland, and that there had been four requests for emergency shutdown, and that two of those requests were black clubs. The city in which 6% of the population is black. And so one was shut down, one wasn't? Or what? I'm having trouble seeing what the inference is from that. The question is, how often does the city of Portland, and under what circumstances does the city of Portland, request that the Oregon Liquor Control Commission issue an immediate suspension? Well, I saw in the five cases that you identified, which had two white owners and one Asian owner. So are you just saying impressionistically, or do you have any specific data? Well, again, specifics are hard to come by in this case, and it's not our position. It's not our position that there are so few black clubs. I mean, 10 years ago there were eight or nine black clubs. There was one left when we wrote our briefs, and that club is now gone. It is admittedly difficult to come up with a large sample for statistics. But the issue is not whether or not our statistics can establish this. The issue on summary judgment is whether we have enough evidence that can show racial animus. And our position is that if you take this evidence, which is admittedly imperfect, and you combine it with the other evidence of racial animus, that it is enough to get beyond summary judgment. Well, racial animus isn't enough, right? So for a 1981 claim, you have to show the bud for causation, as Judge Graber was indicating. And for a 1981 claim, that similarly situated clubs were treated differently. So animus is an element, but it's not sufficient by itself, right? Well, I believe that my understanding is that animus is sufficient, and causation is a separate issue. My understanding is that to get beyond the summary judgment, what you need to show is that there was just a slight showing of racial animus that will get you beyond summary judgment. Then you may have factual issues and questions of causation. But in our particular case, for instance, we would show that— give an example in terms of the decision, the decision to issue the immediate suspension. In this particular case, the OLCC director, Mr. Marks, said that the reason he issued the suspension was because Mr. DeWalt intended to reopen his club that night. Mr. DeWalt never had any intention to open his club that night. No one ever called Mr. DeWalt to ask him if he was going to open his club that night. Yet everybody helped take this man's license away without that. In other words, it was pretextual. It was contrived. And our position is that the reason— Well, pretextual in whose part? I mean, I understand from your reply brief that your racial animus claim runs against the city defendants, but not against Mr. Marks. Is that correct? Well, the city defendants— Start with that. Start with that. Is there a racial animus claim against Mr. Marks? We cannot forward a racial animus claim. There's no evidence that he knew that Mr. DeWalt was black or that this was a black club. So how could his action itself have been pretextual if he had no racial animus? Because it's the request of the city that makes this happen under Oregon law. The OLCC doesn't just typically do it. In this particular circumstance, the city asked that the OLCC issue this suspension. And so it's the racial animus of the city that resulted in— and the misstatements that were made and the misimpressions that the city gave the OLCC that resulted in this occurring. So when you say—usually pretextual is meant— it's a false reason when the actual motivation is something different. And you assigned that to Mr. Marks. You now seem to acknowledge that, well, that wasn't Mr. Marks. What you describe as pretextual is the request made to Mr. Marks by city defendants. But that, again, is limited to city defendants. I believe that's right. We have difficulty showing racial animus on the part of Mr. Marks. However, we do not have difficulty showing that he was part of a conspiracy in this case. The mayor continually pushed for this suspension to take place. The mayor continually pushed. He asked to participate in the hearing on the suspension. When there was a suggestion by the OLCC that the club be given another chance and be given some sort of mitigation agreement, the mayor said, no, no, I want this club shut down. So—and then, of course, Mr. Marks—absolutely racial animus, Mr. Marks, in our view, clearly violated the due process when he refused to allow the hearings officer to issue a decision, when Oregon law specifically says that the hearings officer shall issue a decision. I mean, just to be clear— Council, I have a question about that. When the first suspension was withdrawn and reissued to correct errors that you pointed out, and a second decision was made, am I correct in understanding the record that you did not— your client did not contest the second suspension order and request a new hearing? Is that correct? I believe, Your Honor, that he requested a hearing but did not go forward with the hearing. And his testimony is, just to be clear, and our position is that the minute Mr. Marks did that, in violation of Oregon law without the guise of—without prosecutorial immunity, the minute Mr. Marks decided that he was not going to allow the hearings officer to issue an order based on my client's hearing request, the damage was done. And quite frankly, at that point, we would tell the jury, my client was in a position where he realized that they were playing games with him. There was no legal basis for them to pull the jurisdiction, and he realized that he just couldn't afford to keep going. Well, hadn't your client argued at the end of the first hearing that the procedure was improper and they didn't have jurisdiction to proceed? He argued at the end of the first hearing. I don't know if it was jurisdictional. He argued that the notice was not appropriate. Well, okay, so if the notice is not appropriate, you only argue that if you think that's the reason for not being able to enter a decision— the hearing officer not being able to enter a decision. What other point is there to that argument? No, here's the point. Oregon law, in this very specific case, where you can take someone's license away on an emergency basis with no process whatsoever, ORS 183.430.2 says, If there is no longer an emergency order in place, I'm not sure what the hearings officer is supposed to issue. The hearings officer is supposed to issue a determination on the merits. Think of this situation. This person has had his license taken away. Then why does your client— I'm interrupting because I don't want to use up all of your time, but if your client's lawyer is arguing to the hearings officer there was not proper notice, what else are you supposed to infer from that, that the process is defective and that the hearing officer isn't supposed to enter an order against your client? That wasn't a meritorious argument, it turns out. The fact of the matter is— That's not—I mean, to tell me that your client made an argument that wasn't meritorious doesn't mean that he didn't make that argument. And that the state officer might say, gee, you know, there may be a problem there, so I'm going to start this process over again. Maybe or maybe—I'm sorry, Your Honor. I just don't see what's wrong with that. Once your client's lawyer starts pushing the dominoes over, this is not an illogical result from that argument. Your Honor, it may be that that's the reason that Mr. Marks decided to try to strip illegally, to strip jurisdiction away from the hearings officer, or on the other hand, it may be because as a result of the hearing, the state of Oregon realized it was going to lose the hearing. And he's getting pressure from the mayor and other people saying, we want to go forward. There's an issue of fact on that, and it's certainly a credible explanation that after the hearing was over, that they thought they were going to lose on the merits, and they didn't want to go forward. But the important point is— Counsel? Yes. You have used up your time, and once you finish your answer to Judge Clifton, we will give you one minute for rebuttal, because we've asked quite a few questions. So just wrap up your thought, and we'll hear from the other parties. Okay, the critical point here is that Oregon law allows my client an adjudication on the merits, and however, whatever the arguments were— An adjudication of what? An adjudication of whether the emergency suspension that was issued was properly issued. And if the emergency suspension is no longer in place, our court at least would view the whole thing as moot at that point. How could it be anything else? He did not remove the emergency suspension. He took the jurisdiction away. What he did was he didn't say the emergency jurisdiction suspension is gone. As I recall the facts, he reissued the license. He pulled the jurisdiction purportedly from the hearings officer, so the hearings officer could not issue a decision on the merits, and then he reissued the license. I certainly understand your point, but I don't— Counsel, I think we understand your position. Okay, thank you. Thank you. We'll next hear from the city defendants. Yes. Can the court hear me? Yes. May it please the court, Can I stop for Oregon Liquor Control Commissioner, Director Marks, asking this? Okay. I thought we were going in the other order, but it doesn't matter. Go for it. I'm splitting time evenly with the city. Yes, I know. Sorry. So we ask the court to affirm the district court's judgment. And I'd like to start with absolute prosecutorial immunity for Director Marks' actions in connection with the second suspension order. Now, it's undisputed that Director Marks performs at least some prosecutorial functions, and that he is therefore entitled to immunity for some of his actions under BUCS, under which the U.S. Supreme Court extended traditional prosecutorial immunity to agency officials performing regulatory functions. And plaintiffs agree that Marks is entitled to immunity for issuing the initial suspension order. That's undisputed. And so if that's true, then in our view that means that the administrative process for challenging license suspensions is a sufficient substitute for damage actions, which is fundamental inquiry that guides this court's functional approach to applying BUCS as reflected in the factors identified by this court in BUC Walter. And so if the administrative process, which is to say that the process under the Oregon APA is a sufficient substitute for damage actions arising from the initial suspension order, then it would be just as sufficient for any damage action arising from the second suspension order. And for that reason, Director Marks is entitled to prosecutorial immunity for both actions. And that's what the district court concluded, and this court should affirm on that grounds. And if it does, no further analysis is necessary. But if the court disagrees, then there's just two questions of pre deprivation process and post deprivation process. Again, plaintiffs don't really challenge the ruling on pre deprivation process. And on the post deprivation process, it's not even a question of whether the post deprivation process is sufficient because there is a full APA proceeding contemplated in this process. The only question is whether the delay introduced here was impermissible. And that question is answered by applying the test under Malin. And although all the factors in our view cut against plaintiff, the one that cuts most clearly against plaintiff is the causation or harm factor. As noted in our brief, defendant had already defaulted on their lease before they received any notice of the second suspension order. And so they canceled the delay caused any harm. Let me ask you to focus on the subject of the conclusion of appellants argument, which was the what is alleged to be the unlawful act of trying to repeat the words of the argument used, but I'm not doing a very good job of it of preventing the hearings officer from rendering a decision after the hearing by, and here my hold of the facts may be incomplete by what, what council described as reissuing the license. What is your understanding of what the fact shows to the authority of Mr. Marks to do what he did? So as a legal matter, Marks is entitled to do what he did because under Oregon law and agency is always entitled to withdraw its own orders. I don't think, I don't think it's disputed that an agency can do that. I think the plaintiff is contending that director Marks doesn't have the ability to do that on behalf of the agency. And our argument is that there's no law that, that expressly allows an Oregon for an agency to withdraw its own orders. The courts have held instead that that, that authority is a derivative authority from the authority to issue an order. And here it's clear that the agency has, it has delegated your authority to issue a suspension order to director Marks. And if under Oregon law, the authority to issue an order comes with the authority to withdraw an order, then that must have also been delegated. And so therefore director Marks had the authority to, to both issue the order and then also withdraw the order. And then once it's, once it's withdrawn, of course, he always has the authority to reinstate. I do have some concern about what could be the end effect of this. I visualize a game of, of whack-a-mole. If, if, if a director really wanted to abuse somebody, it's not hard to visualize the process of where a emergency order is issued. They have a hearing. The order is yanked back. A new emergency order is immediately issued. Yeah. You could eventually have another hearing that order is yanked back a new, it doesn't take long to see the potential abuse of that process. Why should that concern lead us to impose a limitation here? So in a case presenting those facts, I agree that potentially there would be a problem. This case doesn't present those facts, but there are a few, a few checks on that sort of problem. First of all, under Oregon law, under ORS 183.43 sub three, there's an opportunity to challenge under the Oregon APA agency action, even in the absence of the final order, you can say if the agency is acting without probable cause. So that might be a good fit for that because you know, the problem that I think plaintiff is arguing, I think you're suggesting your honor is that if there's no final order, there's no way to initiate agency APA review. And so what I've decided to you as a way that you can get review under state law, another, another point that I would make is that the Malin factors, which identify when a delay introduced into post deprivation procedures can rise to a procedural due process violation. Those factors may well turn out differently in the, in the hypothetical that you suggested. If in fact there never comes to be a final order that can be challenged, then the delay, the harm from the delay will be much greater in the inquiry. The analysis under Malin would come out differently than it has as we set forth in our briefs under the facts of this case. How much delay was there here helping with the timeline? Sure. So functionally, I would say really just amounted to a six day delay. What happened is, you know, that the hearing concluded on December 5th and it was at that hearing. It's worth noting that plaintiffs raised this problem. I think, again, the facts would be different if, if we had had, you know, showed up at a hearing and been unhappy with the results and try to find some, some technical reason to withdraw the order. But the reason we did it is because they raised a challenge to it. And so I was on December 5th, December 11th was when the second suspension order issued. Now, as we noted in our brief and as a OLCC official noted, they could have closed the record that day. And if they, or at least soon after soon thereafter, and if they had, then the timeline following the close of the hearing is about 30 days to a final order. So, so if they had closed the hearing immediately, the delay would have been on the order of a couple of weeks at most, and perhaps as little as six days. And it's worth noting that it doesn't really matter because by December 11th, defendants or private plaintiffs had already defaulted on their lease. And that's, I don't think the documentary evidence establishes that. I think beyond a genuine dispute, it may be that plaintiff default wants to has allegations that there was some other reason, but the documentary evidence establishes beyond, beyond dispute that at the time that the, that they defaulted on their lease or rather at the time they received a second suspension order, they had already defaulted on their lease. And if I, if I may, I'd like to reserve the rest of my time for my, my co-counsel, my colleague. Okay. Thank you, Mr. Shaw. We'll hear from the city now. Thank you, your honor. May it please the court, Denis Vanier appearing for the city defendants, the district court in this case properly granted summaries of judgment to the city defendants for several independently sufficient reasons. And this court should affirm is an initial matter. I would like to note that plaintiff's arguments in this case, focus on three of the city defendants and on their race-based claims. Specifically, they focus on the city as an entity on defendant Marchetti and defendant Jackson. And they make no arguments with respect to the other city or to the other claims that they purport to challenge in their brief in particular, the, I would say the first amendment claim, and other non-race-based claims. And so for that reason, as an initial matter, this court should affirm the grant of summary judgment to the city defendants that are not being challenged in this appeal and on the non-race-based claims. Turning to first the claims against the city as judge Graber noted, and one of the key issues in this case is causation. And the test is slightly different as to each defendant. There's a different test for a claim against the city. And there's a different, and the test is slightly different for Jackson and Marchetti for their claims against the city plaintiffs had to point to sufficient evidence to raise a issue of fact to show a deliberate policy, custom or practice that was the moving force behind the alleged constitutional violation. And as this court stated in a gravel, it's Blondin started, say in our brief, that means that the plaintiff must show both both causation and fact and proximate causation here. Plaintiffs could not meet that burden. First, the purported statistical evidence simply does not show statistical disparities. In this case, as judge Akuta observed the record shows that there had been five requests for emergency suspensions at the time of this case, two of those requests involved clubs that were owned by African Americans. One was owned by an Asian American individual and the final two were owned by white individuals. And as the district court explained, I think that is insufficient just as a matter of law to show the existence of a racial disparity. And then of course, because here the license suspension was issued by defendant marks, plaintiffs simply have not pointed to evidence that would show that would be sufficient to raise a question of fact for as this court has said, both causation fact and proximate causation. And so for that reason, this court should affirm the grants of summary judgment as to the city. Now turning to defendant Jackson, I would note that again, so to, to sustain a race-based claim, both equal protection, section 981, claim for race-based discrimination against an individual, you have to point to again, evidence that would not only show animus, but that would show causation. And neither of those exists in the case of defendant Jackson. Plaintiffs do not point to anything that Jackson said or did that would raise any inference of racial animus on his part. And there's nothing in Jackson said or did that would link that purported racial animus to the decision to grant the license suspension. So really, and so for that reason, this court should affirm the summary judgment as to defendant Jackson. And so that really leaves us with defendant Marchetti, which is really where plaintiff focuses their arguments. First of all, you know, for the numerous reasons noted in our brief, there is insufficient evidence to suggest that the few ambiguous comments of defendant Marchetti that plaintiff points to that they're sufficient to show racial animus under both this court's case law and U.S. Supreme court case law. And more significant, again, there is nothing to suggest a direct causal link between any purported animus by Marchetti and again, the decision to issue the temporary suspension. As we point out, for example, I mean plaintiff spends a lot of time talking about Marchetti's belief that Mr. DeWalt was likely to reopen his club on the night of the shooting. As we point out, that belief did not make it into the city suspension letter. Similarly, contrary to what plaintiff argues, director Marks did not testify that he issued the license suspension, the emergency suspension, simply because he was told that the club was going to reopen that night. On the contrary, I would point this court to excerpts of record pages, 342, 43, where Mr. Marks said that he based his decision primarily on the letter from the city. And again, that letter said nothing about the club reopening that night. And he stated that his primarily, his primary concern was the potential for retaliatory violence based on captain Kruger's letter requesting the suspension. And so again, for that reason, plaintiffs cannot show racial animus on the part of defendant Marchetti and more important, cannot show that causal link between any purported animus by Marchetti and the decision to suspend the license. And so for that reason, the district court properly granted a summary judgment in favor of Marchetti and this court should affirm. Unless this court has any more questions, we would ask you to affirm the judgment of the district court. Thank you. Thank you, counsel. It does not appear that any of us has any questions for you, Mr. Volkert. You may have a minute for rebuttal. Wait till it comes up on the clock. Okay. It's all yours. You have to unmute please. Yes, I did. I think. Okay. Thank you. Mr. Marks at ER 344 said that his superordinate concern that caused him to issue the immediate suspension order was that the club was going to be reopened that night. And it's interesting that was not placed in the, in the order. But the fact of the matter is that Teresa Marchetti went out and told the mayor and mayor's assistant and everybody else that my client had been totally uncooperative, that he didn't care, that he was a troubling, it was a problem, club owner, et cetera, et cetera. And also told them that he intended to open that night. And that was simply false. She's the, she is the, she or whoever started that rumor is the cause of the shutdown order. And I would just want to say very quickly, I think, I think Mr. Schott said it is undisputed that an agency can withdraw its order in Oregon. That is not undisputed. The fact of the matter is that under this particular statute, because it's an emergency shutdown, 183430 sub two says that if the licensee demands the hearing and the hearing is held, the agency shall issue an order. It doesn't say anywhere that the, that instead of issuing an order, that the, that the, that the, the director, Mr. Marsh can just simply pull the agency, the hearings officers jurisdiction. It doesn't say that anywhere. Council, you have exceeded your time. And I think that we do understand your position on all the issues. Okay. Thank you. Thank you. The case just started to submit it. And we want to thank all three council for very helpful arguments in this challenging case. Thank you.
judges: Graber, Clifton, Ikuta